UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL NEAL MILLER,

Plaintiff,

v.

RUBY CARTER, et al.,

Defendants.

No.  2:21-cv-1981-DC-EFB (PC)

FINDINGS AND RECOMMENDATIONS

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983.  Plaintiff's original complaint alleges that, in October 2020, when he was housed at Mule Creek State Prison (MCSP), he was diagnosed with Bell's Palsy, with symptoms of facial sagging and difficulty blinking his left eye.  Plaintiff was prescribed medications for facial paralysis and a tongue ulcer, and eye drops to lubricate his left eye.  Plaintiff alleges that, for three days, defendant nurses at MCSP refused to supply his medications and were deliberately indifferent to his serious medical needs.  As a result, plaintiff allegedly sustained a serious eye injury, suffered migraine headaches and vomiting, and required eye surgery.  ECF No. 1.  The court previously found that the complaint asserted potentially cognizable Eighth Amendment deliberate indifference to medical needs claims against defendants Ruby Carter, Amy Nelson, and Antonina Filenko.

/////

1

On March 26, 2024, the court granted plaintiff's motion for leave to amend his complaint to add defendants S. Cooper and M. Ahady.  ECF No. 41.  He alleges that nurse Cooper refused to give him his prescribed medications, and that he filed a staff complaint against her, which received a response in August 2021.  First Amended Complaint (FAC), ¶¶ 15-17.  The FAC also alleges that defendant Dr. Ahady examined plaintiff in March 2021 and removed a cyst from his left eye, which he was "not authorized" to do. FAC, ¶¶ 27-28.

Defendants Nelson, Cooper, and Filenko are licensed vocational nurses (the "Nurse Defendants") at Mule Creek State Prison (MCSP).  They have filed a motion for (partial) summary judgment as to the claims against them, to which plaintiff has responded, and they have replied.[1]  ECF Nos. 60, 63, 64.  For the following reasons, the Nurse Defendants' motion for summary judgment must be denied as to Nelson and Cooper, and granted as to Filenko.

**The FAC**

Plaintiff suffered from a condition known as Bell's Palsy, which according to the FAC, is a short-term paralysis of muscles in part of the face, resulting from inflammation or compression of the facial nerve which is "responsible for facial movements that include blinking, closing of the eyes, smiling, and frowning."  ECF No. 35 at 5-6; *id*. at 25.  This condition may be treated with antiviral drugs, steroids, pain relievers, and eye drops or ointment to moisten and protect the eye, and the "goal of treatment is to reduce inflammation 'and protect the eye from damage.'" *Id*. at 6.  Plaintiff alleges that the care he received from the Nurse Defendants in the days immediately following his Bell's Palsy diagnosis was deliberately different to his serious medical needs.

Plaintiff awoke the morning of October 19, 2020 with left-sided facial drooping.  *Id*. at 4. He had had constant migraine headaches for the previous five days and had developed an oral ulcer on his tongue.  *Id*.  He was transported to Sutter Amador Hospital (SAH) where Dr. Juby

---

[1]  Ahady has not joined in the Nurse Defendants' motion for summary judgment. *See* ECF No. 60 at 1 ("Defendants Cooper, Filenko, and Nelson move this Court for summary judgment"); ECF No. 60-1 at 7 (same); *see also Pearson v. Apria Healthcase Group, Inc*., No. 21-55786, 2023 WL 3244001, at *1 (9th Cir. May 4, 2023) ("Pearson's summary judgment motion, though not titled as such, was a motion for partial summary judgment.").

diagnosed Bell's Palsy and prescribed Valtrex (an antiviral medication[2]), prednisone (a steroid medication[3]), and eye drops. *Id*. at 5-6; *see also id*. at 21-26; ECF No. 63-1 at 22, 23 (Juby's discharge instructions). According to the medical records plaintiff attached to his FAC, both the Valtrex and the prednisone were to be taken once daily for 7 days.[4] ECF No. 35 at 23, 26.

Plaintiff was returned to MCSP the same morning of October 19, 2020 and was placed in quarantine in A-Yard, away from his regular housing in C-Yard.[5] Nonparty Dr. Snook at MCSP immediately ordered the medications that Juby had prescribed. *Id*. at 6-7.

Defendants Nelson, Cooper, and Filenko were responsible for dispensing medications in the A-Yard quarantine unit. Plaintiff alleges that they were unresponsive to his requests to locate the Bell's Palsy medications that Snook had ordered, and that they refused his requests to look for them on C-Yard. *Id*. at 9. He alleges he was in the worst pain of his life and his head hurt so badly he vomited for two days until he received medication. *Id*. at 7-8. The grievance records that plaintiff attaches to his FAC provide additional context, in that it seems the medications actually may have been located on C-Yard. As stated in plaintiff's grievances, "all of the medications that were ordered for my Bell['s] Palsy were distributed 10-19-20 but got sent to 'C' Yard where they were 'lost' for the next 1/2 a week." *Id*. at 35; *see also id*. at 36 ("Thank God one of the nurses worked on 'C' Yard,[6], saw my meds, and sent them to 'A' Yard a few days

---

[2] Valtrex is a brand name for the antiviral drug valaciclovir. *See* https://en.wikipedia.org/wiki/Valaciclovir. In this record, this drug is sometimes referred to by other names such as acyclovir and valacyclovir. *See* ECF No. 60-4 at 3; ECF No. 63-1 at 33. For consistency and because it is the name most often appearing in the record, the court will use the term "Valtrex."

[3] Prednisone is a steroid drug. *See* https://en.wikipedia.org/wiki/Prednisone. In the record, this drug is sometimes referred by other names such as deltasone or cortisone. *See* ECF No. 35 at 23; ECF No. 60-4 at 3 ¶ 8(b). For consistency and because it is the term most often appearing in the record, the court will use the term "prednisone."

[4] There are apparently two alternative methods for administering the prednisone, both of 7 days duration. ECF No. 35 at 23. It appears that Juby recommended the method of taking two tablets once daily for 7 days. *See id*. at 26.

[5] A-Yard (the medical quarantine facility) and C-Yard (plaintiff's regular housing unit) are sometimes identified in the record as "Facility A" and "Facility C." *See, e.g.*, ECF No. 60-7 at 2 ¶ 4 (Filenko Aff.). For consistency, the court will use A-Yard and C-Yard designations.

[6] The nurse who allegedly found the medications on C-Yard is not named. None of the Nurse Defendants mentions this in their declarations, nor claims to have located the medications

3

later."); *id*. at 58 ("My meds were on C-Yard, but I was quarantined on A-Yard.").

Plaintiff also alleges he did not receive the full 7-day course of these medications because of the delay at the outset. *Id*. at 11. He received one dose of Valtrex on October 21, 2020, and four daily doses of prednisone from October 22 to October 25, 2020. *Id*. at 11, 12. He alleges the medications were needed to prevent eye damage, which he did experience and also a cyst developed on his eye because of the delay and/or the incomplete course of treatment. *Id*. at 7-11.

**The Parties' Exhibits**

Documents that plaintiff attached to his verified FAC will be considered as part of the record on summary judgment. *See, e.g.*, *Craven v. Davis,* No. C24-5461 TSZ, 2025 WL 1685647, at *1 (W.D. Wash. June 11, 2025) (attachment incorporated by reference into verified complaint was part of the record on summary judgment); *Lechner v. LVMPD*, 696 F. Supp. 3d 963, 978 n.2 (D. Nev. 2023) (exhibits cited and attached to complaint considered on summary judgment because pro se filings are construed liberally); *Wacker v. Hammerking Productions, Inc.*, 608 F. Supp. 3d 947, 953 n.4 (C.D. Cal. 2022) (complaint and its attachments considered on motion for summary judgment). These are medical records and related grievances, the latter of which relevant to defendants' administrative exhaustion defense. ECF No. 35 at 19-104.

The Nurse Defendants submit their own declarations, as well as the declaration of their retained expert Dr. Shabo, and the declaration of non-retained expert Dr. Snook.[7] They also submit plaintiff's medical records, and they rely on excerpts from plaintiff's deposition.[8]

In opposition to summary judgment, plaintiff submits: (1) his own declaration; (2) Dr. Juby's discharge instructions dated October 20, 2020; (3) a record of his encounter with Nurse

on C-Yard.

[7] Snook, who is a physician and surgeon employed by the California Department of Corrections and Rehabilitation (CDCR) at MCSP, submits records of plaintiff's medical history and has also offered his professional opinion. ECF No. 60-3 at ¶¶ 1, 3, 54. The court here considers plaintiff's medical history and records submitted by Snook, but not Snook's professional opinion.

[8] ECF No. 60-3 (Snook); ECF No. 60-4 (Shabo); ECF No. 60-5 (Cooper); ECF No. 60-6 (Nelson); ECF No. 60-7 (Filenko); ECF Nos. 60-8 through 60-13 (medical records); ECF No. 60-14 (Pltf. Depo.).

4

Xiong dated October 22, 2020; (4) medication administration records; (5) copies of forms that he used to request health care services, beginning on October 17, 2020 and through October 11, 2021; (6) a record of an October 29, 2022 eye examination; and (7) his discharge instructions from SAH.  ECF No. 63-1.

## Summary Judgment Standard Under Rule 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, . . ., is satisfied."  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987), *overruled on other grounds as stated in Flood v. Miller*, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**Deliberate Indifference Standard**

To succeed on an Eighth Amendment claim predicated on deliberate indifference to a need for medical care, a plaintiff must establish that: (1) she had a serious medical need; and (2) the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical care need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096. Deliberate indifference may be shown by the denial, delay, or intentional indifference with treatment, or by the way in which care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, a defendant will be liable for violating the Eighth Amendment if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

Mere indifference, negligence, or medical malpractice, do not support an Eighth Amendment claim. *Broughton v. Cutter Laboratories*, 622 F.2d 4548, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "Rather, to prevail on a claim involving choices of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Further, a plaintiff must have suffered some type of pain or harm that is more than de minimis in order to implicate the Eighth Amendment. *See, e.g.*, *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("delay of surgery, without more, is insufficient to state a claim of deliberate medical

indifference … unless the denial was harmful").

**Analysis**

The court begins its analysis by setting forth the reasons why plaintiff has shown a genuine issue that delay in providing his prescribed medications may have constituted deliberate indifference. The court thereafter discusses how the deliberate indifference standard applies to the actions of the individual Nurse Defendants. The court concludes that defendants have failed to carry their burden with respect to defendants Nelson and Cooper, but that summary judgment must be entered in favor of defendant Filenko.

A.    Bell's Palsy Is a Serious Medical Need

Defendants do not dispute that Bell's Palsy is a serious medical need. *See* ECF No. 60-1 at 20-28; *see also Gutierrez v. Sandoval*, No. 1:20-cv-01130-KES-EPG, 2025 WL 436083, at *1 (claim of deliberate indifference in treatment of Bell's Palsy proceeded to trial); *Dorsainvil v. Gallagher*, No. 15-3035, 2022 WL 17887224, at *4 (D.N.J. Dec. 23, 2022) (Bell's Palsy is a serious medical need); *Toliver v. Olmstead*, No. 14-cv-01064-NJR, 2014 WL 5465106, at * (S.D. Ill. Oct. 28, 2014) (Bell's Palsy that caused plaintiff to experience allegedly intolerable pain is an objectively serious medical condition).

B.    The Delay in Dispensing the Prescribed Bell's Palsy Medications

After plaintiff returned from SAH with the Bell's Palsy diagnosis on October 19, each of the Nurse Defendants had encounters with him in the A-Yard quarantine unit while they were delivering other medications to him.[9] It appears from this record that medications were distributed at least twice daily, in the morning and in the evening.

The parties agree that plaintiff received only one dose of the Valtrex (on October 21) and four doses of the prednisone (on October 22, 23, 24, and 25), and that he did not receive the full 7-day course of either medication. *See* ECF No. 60-4 at 3 ¶ 8(b) (Shabo Decl.). He also did not receive the prescribed eye drops (artificial tears) until October 21. *Id*. Defendants offer no

---

[9] The record repeatedly references other medications (such as clonidine and acetaminophen) unrelated to his Bell's Palsy prescriptions, and which the Nurse Defendants dispensed to plaintiff. These other medications are mentioned only to the extent they are relevant to the court's analysis.

explanation why plaintiff received only one dose of Valtrex and four doses of prednisone, and they do not appear to dispute that some or all of the missing doses of both medications may have been sent to, and could have been found at, plaintiff's regular housing assignment on C-Yard.

According to defendants' expert Dr. Shabo, the delay in initially dispensing the medications "would not have caused any serious or significant complications" because "[t]he medical literatures indicate that if cortisone [i.e., predisone] and acyclovir [i.e., Valtrex] are used [to treat Bell's Palsy], they should be prescribed within three days." *Id*.  Shabo does not specify the source of this 3-day time frame.  His conclusion is that plaintiff timely received initial doses of medications because the Valtrex and eye drops were first dispensed to plaintiff (by Filenko) on October 21 and the prednisone was first dispensed (by Cooper) on October 22, within three days of October 19, 2020 – the date when plaintiff awoke with facial drooping.  *Id*.

Plaintiff counters that the onset of the disease was October 17 and not October 19, based on other symptoms that he had experienced two days before awakening with facial drooping on October 19.  ECF No. 63 at 11; *see also* ECF No. 63-2 at 34-35 (Disputed Fact No. 55).  Plaintiff submits records in support of the October 17 onset date, and of notice by the defendants, including: (1) a health care services request he made on October 17 complaining of a very painful ulcer on his tongue; and (2) another health care services request on October 18 complaining of "a migraine for 3 days that is giving me an ear ach[e]" and "fluid behind my ear drum that makes my hearing go out and makes me dizzy."  ECF No. 63-1 at 16, 18.  The FAC also attaches a California Correctional Health Care Services (CCHCS) medical record dated October 19, 2020 which noted plaintiff's "5 days headache, two days oral ulcer, woke up with left sided facial droop".  ECF No. 35 at 19.  According to plaintiff's onset argument, the Bell's Palsy medications may have been timely prescribed within the 3-day window Shabo mentions, but the initial doses of Valtrex on October 21 and of prednisone on October 22 were not actually dispensed within that 3-day window if plaintiff's Bell's Palsy onset was October 17 rather than October 19.

Also, it is unclear what Shabo intends by his assertion that a delay would not have caused any serious or significant complications, and how this might specifically apply to plaintiff's circumstances in a short-term or long-term way.  Plaintiff's claim is that the medications were

actually ordered and available as of October 19, yet delivery to him was unnecessarily delayed until October 21 and 22 because the Nurse Defendants failed or refused to locate them on C-Yard. ECF No. 63-2 at 7 (Disputed Fact No. 14). And while he was awaiting the medications he suffered pain and other symptoms, even though it appears that these eventually (and sometimes much later) resolved. Plaintiff has shown a genuine factual issue whether an unnecessary delay in dispensing the medications might support his claim of deliberate indifference.

C.      Harm to Plaintiff

Defendants next argue that a slight delay in administering medication does not constitute deliberate indifference. ECF No. 60-1 at 22 (citing *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998), *Berry v. Bunnell*, 39 F.3d 1056 (9th Cir. 1994), and *Wood v. Housewright*, 900 F.2d 1332 (9th Cir. 1990)). But *Berry* holds that this is true only if the delay did not cause harm. 39 F.3d at 1057. In this case, plaintiff alleges multiple forms of harm because of the delay.

Defendants note that plaintiff has a longstanding condition of migraine headaches. They argue there is no evidence that the delay in starting the Bell's Palsy medications worsened plaintiff's migraines and they also maintain that his medical records do not document complaints of pain. ECF No. 60-1 at 24. But this is not entirely accurate because plaintiff shows evidence of his complaints about pain that are documented in a request for medical attention, in addition to the verbal complaints he alleges. And plaintiff's evidence also shows he complained of pain in his neck and in his eye and other difficulties, not just migraines or headaches. Plaintiff points to his health care request dated October 21, in which he reported that:

> The symptoms of my Bell['s] Palsy have gotten worse. The pain in my neck is 9 out of 10. My face has gotten worse and it's hard to swallow. I have been waiting for meds for 3 days. I need to see a Dr. I'm in so much pain.

ECF No. 63-1 at 25. He also alleges he reported his pain and worsened symptoms to the nurse while he awaited delivery of the prescribed medications. *Id*. at 4. And plaintiff denies telling nonparty nurse Xiong that he had no pain on October 20. *Id*. at 13 ¶ 57.

Shabo opines that Valtrex and prednisone are not pain medications, and that the nerve that paralyzes facial muscles in Bell's Palsy "is not a sensory nerve that senses pain." ECF No. 60-4 at 3 ¶ 8(c). But Shabo acknowledges that these medications are prescribed to treat Bell's Palsy,

*id.*, and defendants do not appear to dispute that Bell's Palsy may cause pain, even if not felt in the nerve that paralyzes facial muscles.  Plaintiff's SAH discharge instructions told him to report neck pain, difficulty swallowing, or worsened symptoms, which indicates that some forms of pain are plausibly caused by and/or associated with Bell's Palsy.  ECF No. 63-1 at 73.  And plaintiff alleges that he did have the symptoms in the discharge instructions, including the neck pain and difficulty swallowing mentioned in his October 21 health care request, and that he reported this.  *Id.* at 4.

Defendants also assert that plaintiff did not complain of vomiting during this time period, and they claim that plaintiff denied vomiting in his encounter with Xiong on October 22.  ECF No. 60-1 at 23.  But plaintiff alleges he told defendant Cooper that he had been vomiting for two days.  ECF No. 35 at 7 ¶ 15.

Plaintiff maintains that the delayed and/or incomplete course of medications also impeded his recovery, that he was unable to close his left eyelid, and that this led to problems with his vision which persisted for some time.  He submits a health care request dated November 2, 2020, in which he complained:

> I need to go back to optometry.  I have lost most of the vision in my left eye since I came back from the hospital with Bell['s] Palsy.  I think it was damaged because it couldn't close and I wasn't given eye drops for 3 days.

ECF No. 63-1 at 44.  In another health care request dated November 3, 2020, he asked for eye drops to numb his eye, because it felt "like there is sand in it" and "hurts very bad!"  *Id.* at 46.  In yet another health care request dated November 14, 2020 he was "still having a lot of issues" including continuing pain in his eye "for weeks now" and that the nerve behind his ear was painful.  *Id.* at 48.  On December 1, 2020, plaintiff continued to complain of "a lot of pain" in his "same eye" that had "been like this for over a month."  *Id.* at 50.  A nursing assessment on December 3 noted that plaintiff complained of left eye pain and decreased up close vision.  ECF No. 60-3 at 10 ¶ 37.  A nursing assessment on February 2, 2021 noted that that plaintiff reported his left eye was better, with a continued feeling of dryness and some pain with decreased visual acuity.  *Id.* at ¶ 40.[10]

---

[10]  Plaintiff was eventually seen by defendant optometrist Dr. Ahady on March 10, 2021.

11

Dr. Shabo opines that there was no permanent damage to plaintiff's vision and that plaintiff's medical records reflect only "intermittent eye discomfort that was treated with artificial tears." ECF No. 60-4 at 4 ¶ 8(d) - (e). He also opines that "[t]here was never any indication of a loss of vision or a need for eye surgery due to the Bell's Palsy or the treatment that was provided" and he points to an October 29, 2022 eye examination which showed better visual acuity than plaintiff's examination of October 15, 2020, shortly before he contracted Bell's Palsy. *Id.* But plaintiff's eventual recovery of his vision as of October 2022 does not contravene his complaints of eye pain and decreased vision from October 2020 through February 2021, or address whether the incomplete course of Bell's Palsy medications led to unnecessary eye pain and vision loss, even if impermanent.

Plaintiff claims that the failure to properly administer the prescribed medications also led to the development of a cyst on his left eye that was removed by Ahady in March 2021. ECF No. 35 at 11 ¶ 23; *see also* ECF No. 63-1 at 10 ¶¶ 42-43. Defendants dispute whether the medication delay caused the cyst.[11] ECF No. 60-1 at 22-23. The court need not reach the question whether the cyst was caused by issues with the Bell's Palsy medication delivery because plaintiff has otherwise shown sufficient and genuine issues whether the delay in dispensing his prescribed medications caused him to suffer pain (including in his neck and eye), and that he could not close his eye and that his vision was adversely affected, at least temporarily.

Plaintiff has shown a triable issue as to whether delay and incomplete administration of the Bell's Palsy medications may have been deliberately indifferent to his serious medical needs. The next question is whether there is a genuine issue as to deliberate indifference on the part of the individual Nurse Defendants.

/////

---

ECF No. 60-3 at 11 ¶ 42. Defendants submit evidence regarding care provided by Ahady, *see id.*, but the court does not address this because their motion does not include plaintiff's claim against Ahady.

[11] Shabo explains that cysts are typically a localized infection and the initial treatment is an antibiotic eyedrop or pills. ECF No. 60-4 at 5 ¶ 8(g). His opinion is that the cyst was "[i]n no way … related to a delay in the treatment of [plaintiff's] Bell's Palsy or for not getting prednisone and Valtrex for seven days." *Id.*

D.      The Individual Nurse Defendants

1.      Nelson

Plaintiff's Eighth Amendment claim against Nelson is based on a single encounter on October 19, 2020.  ECF No. 60-6 at 2 ¶ 6.  It is clear that the encounter with Nelson must have been during the evening medication delivery, because it can only have occurred after plaintiff was returned from SAH and placed in the A-Yard quarantine unit.  The parties agree that Nelson delivered medications to plaintiff, but not the Valtrex, prednisone, and eye drops prescribed for his Bell's Palsy.  Plaintiff told Nelson he had a headache and severe left eye pain and that he needed the medications prescribed for his Bell's Palsy, and he asked her to call the on-call physician.  ECF No. 63-1 at 2-3.  He alleges Nelson replied "I'm not going to call for you, there is nothing I can do for you.'" *Id*. at 3 ¶ 11; *see also* ECF No. 35 at 10 ¶ 21.  His FAC also alleges that plaintiff specifically asked Nelson to look for the medications on C-Yard, but Nelson refused "to even make a phone call."  ECF No. 35 at 10 ¶ 21.

Nelson declares that neither the Valtrex nor the prednisone was available in her cart or "at the Facility's[12] clinic to administer."  ECF No. 60-6 at 2 ¶ 7.  Nelson does not deny that the medications might have been sent to plaintiff's regular housing on C-Yard.  She also does not deny that plaintiff asked her to look for them on C-Yard or that she did not do so.  Nelson instead points to other considerations.  She describes procedures for checking for medications in Omnicell, the Triage and Treatment Area (TTA), or the pharmacy, but it seems she did not follow those procedures because the medications were not designated as needing urgent delivery (STAT), and also because she assessed plaintiff was not in pain.  But she does not deny that plaintiff reported pain to her or explain any basis for her assessment that he was not in pain.  *See Lopez v. Florenz*, No. 1:08-cv-1975-LJO-JLT, 2013 WL 57191516, at *6 (E.D. Cal. Oct. 21, 2013) (denying summary judgment to nurse who failed to provide prescribed post-operative pain medication based on assessment that pain was not significant).

////

---

[12]  The court construes this as a reference to the A-Yard or "Facility A" clinic, where plaintiff was quarantined.

13

On this record, plaintiff has shown a triable issue whether Nelson's refusal to inquire or to attempt to locate the Bell's Palsy medications on C-Yard was deliberately indifferent to plaintiff's serious medical need.  Summary judgment must be denied as to the Eighth Amendment claim against Nelson.

2.      Cooper[13]

The parties agree that Cooper delivered medications to plaintiff on October 20, 21, 22 and 23, 2020.  Plaintiff alleges that on October 20 and 21 he repeatedly asked Cooper for the prescribed Bell's Palsy medications.  ECF No. 35 at 7 ¶ 15; ECF NO. 63-1 at 3 ¶ 12.  He informed her he was in the worst pain of his life, and his "head hurt so bad he vomited for two days."  ECF No. 35 at 7 ¶ 15.  Plaintiff alleges showing his discharge instructions from SAH which instructed him to report worsened Bell's Palsy symptoms and that he had 5 out of 8 of such reportable symptoms.  ECF No. 63-1 at 4 ¶19; *see also id*. at 73 (discharge instructions).  Cooper allegedly responded:  "I know what Bells [sic] Palsy is, it's an infection, it will go away" and "[t]here is nothing I can do for you, fill out a med slip."  ECF No. 35 at 8 ¶ 15.

Cooper declares that on October 20 and again on October 21, 2020 the prednisone and other medications prescribed for plaintiff were not available in the medical cart or in the A-Yard clinic.  ECF No. 60-5 at 2-3 ¶¶ 8, 9.  She "tried to locate these medications in the system, but [] could not find them."  *Id*. at 2 ¶ 8.  She also "elevated the issue to the pharmacy and to the primary care physician."  *Id*. at 3 ¶ 8.  But Cooper does not explain what these efforts entailed and she does not address whether the medications might have been located on C-Yard, nor deny that

---

[13] Plaintiff appears to have at times confused defendant Cooper with another nurse named Carter who may have delivered medications on the same days as Cooper, but at different times. In his initial complaint, plaintiff named Carter but not Cooper as a defendant, but the claim against Carter has been dismissed and Cooper has been added as a defendant.  ECF No. 41; *see also* ECF No. 35 at 34, 36 (plaintiff's grievance records show an apparent confusion about whether the "3d watch nurse" was Carter or Cooper).

Cooper's own declaration acknowledges that it was she who made the morning medication deliveries on October 20-23, 2020.  ECF No. 60-5.  Plaintiff's confusion in identifying Cooper and her actions (versus Carter and her actions) nevertheless appears to persist at places in this record.  *See, e.g*, ECF No. 63-1 at 4 (plaintiff appears to mistakenly attribute the actions of "LVN Cooper" versus those of "defendant Ruby Carter" and vice versa).  Because Cooper has declared it, the court construes that she (and not Carter) is the nurse who plaintiff alleges to have refused to try to locate the prescribed Bell's Palsy medications on C-Yard the mornings of October 20 and 21.

14

she did not attempt to locate them there.

Cooper declares she did not observe plaintiff in need of urgent medical care, *id*. ¶ 12, but this is contradicted by plaintiff's account that he reported to her "the worst pain of his life." ECF No. 35 at 7 ¶ 15. Also, on October 21 plaintiff contemporaneously submitted his health care request in which he complained that his symptoms had worsened, the pain in his neck was 9 out of 10, his face had gotten worse and it was hard to swallow, he had been awaiting medications for three days and he was in "so much pain." ECF No. 63-1 at 25.[14]

Defendants argue that plaintiff's claim against Cooper is contradicted by a statement in the course of a grievance investigation that Cooper "was nothing but helpful to me!" ECF No. 60-1 at 27. But as noted, plaintiff appears at times to have confused Cooper's name with that of with another nurse, and he continues to maintain that Cooper is the nurse who refused to attempt to locate his Bell's Palsy medications on October 20 and 21. And for her part Cooper acknowledges she is the nurse who delivered medications those mornings. This single statement of plaintiff's was plausibly a mis-statement, and as such is an insufficient basis to grant summary judgment on behalf of Cooper.

On this record, plaintiff has shown a triable issue whether Cooper's refusal to inquire or to attempt to locate the Bell's Palsy medications on C-Yard was deliberately indifferent to plaintiff's serious medical need. Summary judgment must be denied as to the Eighth Amendment claim against Cooper.

3.     Filenko

Plaintiff's claim against Filenko is based on a single encounter on October 21, 2020, during the evening medication pass. ECF No. 60-7 at 2 ¶¶ 7, 8; ECF No. 60-3 at 6 ¶ 16. She dispensed only Valtrex, but not prednisone, to plaintiff, because the prednisone was unavailable "either in the medical cart or in Facility A clinic." ECF No. 60-7 at 2-3 ¶ 8. The FAC alleges Filenko refused to look for the prednisone on C-Yard, ECF No. 35 at 9 ¶ 18, whereas Filenko

---

[14] On the morning of October 22 and again on the morning of October 23, the prednisone was available and Cooper gave plaintiff two tablets each day. ECF No. 60-3 at 3 ¶¶ 10, 11. Plaintiff received additional doses of prednisone (but not Valtrex) on October 24 and 25, 2020, dispensed by nondefendant nurses Easley and Nze. *Id*. at 7 ¶¶ 22, 23.

declares she tried to locate the prednisone "in the system" although she does not explain what this means. ECF No. 60-7 at 3 ¶ 8. She also declares she did not observe plaintiff in need of urgent medical care. *Id.* ¶ 12.

But plaintiff's own declaration now describes a different version of events. Plaintiff declares that Filenko told him the prednisone "could only be issued once a day at morning pill call distribution at 7:00 a.m." ECF No. 63-1 at 6 ¶ 26. Thus, plaintiff himself explains why Filenko did not have the medication to dispense to him the evening of October 21. *See* ECF No. 60-3 at 6 ¶ 16 (Filenko's encounter with plaintiff was at 6:26 p.m.). According to plaintiff's declaration, an inquiry to C-Yard that evening would have been futile because prednisone was only distributed during the morning pill call. And as already noted, the prednisone was indeed dispensed to plaintiff by Cooper the following morning of October 22. It is curious that Filenko does not provide this explanation about the prednisone, nevertheless plaintiff's own declaration defeats his allegation that Filenko was deliberately indifferent in refusing to locate the prednisone on C-Yard the evening of October 21. Plaintiff has not shown a genuine issue for trial as to his claim of deliberate indifference against Filenko, and summary judgment must be entered in favor of Filenko.

### Defendants' Remaining Deliberate Indifference Arguments

Defendants also argue that the care provided to plaintiff conformed with community standards, that a mere disagreement with care decisions does not constitute deliberate indifference, and that plaintiff was provided with other forms of care for his Bell's Palsy. ECF No. 60-1 at 24-28; ECF No. 64 at 1. These arguments are unavailing.

First, community standards are "not the relevant standard for a section 1983 claim." *Roberts v. Hensley*, No. 15cv1871-LAB (BLM), 2017 WL 715391, at *3 (S.D. Cal. Feb. 23, 2017).

Second, this record does not show any difference of opinion that might be material to plaintiff's Eighth Amendment claims. Dr. Juby and Dr. Snook appear to have agreed that plaintiff needed Bell's Palsy medications, which were prescribed immediately on October 19, 2020. The Defendant Nurses do not claim they disagreed with the physicians' assessment that

16

plaintiff needed those prescribed medications; it is physicians and not nurses who prescribe medications.  To the extent the nurses claim to have disagreed with plaintiff about his urgent need to receive the medications, any such disagreement does not defeat plaintiff's claims because Snook had ordered the medications as of October 19, and his assessment as the prescribing physician is controlling.[15]

Third, other forms of care that plaintiff received while he was recovering from Bell's Palsy have no bearing on plaintiff's claim that the Defendant Nurses were deliberately indifferent in the care they provided.

The motion for summary judgment must be denied as to the Nurse Defendants' arguments about community standards, differences of opinion, and other care provided for plaintiff's Bell's Palsy.

**Grievance Exhaustion**

Defendants Nelson, Cooper, and Filenko argue that plaintiff failed to exhaust his administrative remedies as to the claims against them.  ECF No. 60-1 at 28-29.  They concede that plaintiff did initiate and exhaust grievances, but they maintain that those grievances did not sufficiently describe the substance of the claims he now brings in this lawsuit.  *Id*.  They argue that none of plaintiff's grievances "claim that Nelson, Cooper, or Filenko ignored [plaintiff's] medical emergencies during their encounter with him on October 19, 20, and 21, 2021 [sic], respectively."  *Id*.  They claim the grievances "only complained that his medications were erroneously sent to a different housing unit than he was housed, a 'third watch' nurse refused to locate his missing medication, and Defendants Nelson and Filenko refused to dispense his prescribed medication or request them from C-Yard on October 19, and 21, 2020, respectively."  *Id*.

The Ninth Circuit Court has held that a grievance sufficiently establishes exhaustion if it alerted prison officials to the issue and any need for appropriate responsive measures.  *Griffin v. Arpaio*, 557 F.3d 1117, 1120-1121 (9th Cir. 2009); *see Johnson v. Roesserr*, No. CV 18-10207-

---

[15] If the nurses had disagreed with plaintiff's complaints that he needed the medication, it would tend to show that the failure to act was deliberate.

17

VBF (KK), 2019 WL 3720096, at *5 (C.D. Cal. June 28, 2019) (rejecting argument that plaintiff's grievance that defendants "excessively threw" him into his cell failed to exhaust his claim of being "forcefully dragged"); *Billips v. Myers*, No. 3:23-cv-04003-GCS. 2025 WL 2652006, at *3 (S.D. Ill. Sept. 16, 2025) (plaintiff's grievance stated he had complained of stomach issues and it was "not a stretch" to construe plaintiff's grievance as having exhausted a claim that medical staff "ignored or did not properly and timely address his medical issues").

In this case, plaintiff's grievances explicitly and succinctly complained that the Bell's Palsy medications were sent to C-Yard and were lost there and that one or more nurses refused to look for them. ECF No. 35 at 35, 36 , 57, *see also id*. at 72 (plaintiff did not initially have nurse names). Plaintiff's grievances were clearly sufficient to alert prison officials to the medication delivery issues he alleges in his claims against Nelson, Cooper, and Filenko. Defendants' argument that plaintiff failed to exhaust administrative remedies is not persuasive and does not provide a basis for granting summary judgment.

### Violations of Prison Policy

Defendants maintain that violation of prison policy is not a basis for any claim of constitutional violation. ECF No. 60-1 at 29-30. This is a correct statement of legal principle but it is inapplicable to this case because plaintiff does not allege liability based on policy violations. Plaintiff has attached grievance records showing that he pursued and exhausted grievances which resulted in findings that staff had violated prison policy. ECF No. 35 at 31, 53, 68. Plaintiff submits these grievances to show exhaustion and not to allege any claim based on violations of prison policy. *See id*. at 3 (FAC alleges claim for "Eighth Amendment indif[f]erence to medical needs violation"); *id*. at 8, 9, 11, 26 (FAC alleges exhausted grievances). Defendants' exhaustion argument does not support entry of summary judgment.

### Qualified Immunity

Defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted). A defendant is entitled to

qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2010). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. at 743.

Showing the unlawfulness of the conduct was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id*. (citation and internal quotation marks omitted); *see also Kisela v. Hughes*, 540 U.S. 100, 105 (2018) (per curiam) ("An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" (citation omitted)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (alteration in original) (quoting *Wesby v. District of Columbia*, 583 U.S. 48, 64 (2018)).

The Supreme Court has warned courts not to define clearly established law "at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Kisela*, 540 U.S. at 104. "[T]he farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). But "officials can still be on notice that their conduct violated established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'") (alteration in original) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Whether such a clearly established right exists is "a question of law" for the court to decide. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017)).

////

19

The court need not address the qualified immunity argument as to Filenko because it recommends that the Eighth Amendment claim against her be dismissed on its merits. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

As to Nelson and Cooper, their qualified immunity argument is in two parts. They first argue that there has been no constitutional violation. ECF No. 60-1 at 30-31. But this argument is unavailing because the court finds that a factfinder might conclude that Nelson and/or Cooper failed to provide constitutionally adequate care. Their next argument is that a reasonable official in their position would not have known that their alleged conduct was unlawful in the situation they faced. ECF No. 60-1 at 31 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). They maintain that plaintiff "cannot show that it would have been clear to a reasonable prison official that providing the extensive medical care that Miller received for his Bell's Palsy condition would be found inadequate under the Eighth Amendment." *Id*. This assertion also misses the mark. Nelson and Cooper cannot rely on other care provided to plaintiff, by other providers at other times, to avoid liability for their own roles and their own obligations to provide constitutionally adequate care.

The correct standard is whether a reasonable nurse in the position of Nelson and/or Cooper would not have known that their conduct violated clearly established constitutional rights. *Pearson*, 555 U.S. at 231. As to Nelson, the question is whether a reasonable nurse in her position would have known that not attempting to locate his prescribed medications – as he requested – on C-Yard or by calling the on-call physician the evening of October 19, 2020 would prevent plaintiff from having access to medication necessary to treat a serious medical need. She argues she assessed that this was unnecessary because the Bell's Palsy medications were not designated as "STAT" by the prescribing physician, and she declares she did not observe plaintiff to be in pain. But plaintiff claims he told Nelson he had headache and severe left eye pain and needed his prescribed medications and Nelson cannot show that a reasonable nurse in her position would not have made an inquiry to the on-call physician and/or to C-Yard to attempt to locate the

20

prescribed medications.  *See Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (it is "clearly established" that prison officials may not "intentionally deny or delay access to medical care"); *Lopez*, 2013 WL 57191516, at *2-3, 10 (denying qualified immunity to nurses who failed to administer prescribed post-surgery pain medications).  Also as to Cooper, she cannot show that a reasonable nurse would not have made inquiries when the medications were still not on her cart two and three days after Snook had prescribed them.  For these reasons, the court must deny grant summary judgment for Nelson and Cooper on the basis of qualified immunity.

## ORDER AND RECOMMENDATIONS

For the foregoing reasons, it is hereby RECOMMENDED that:

1.    The motion for summary judgment (ECF No. 60) be GRANTED IN PART as to defendant Filenko, and

2.    The motion for summary judgment (ECF No. 60) be DENIED IN PART as to defendants Nelson and Cooper.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 26, 2026

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

21